HELEN FERRIDAY *vs.* BENJAMIN GROSVENOR.

First Judicial District, Hartford, March Term, 1913.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

In an action for trespass to land, a plaintiff who has alleged ownership and possession makes out a prima facie case by laying in evidence deeds constituting a chain of title reaching back to a grantor who admittedly owned the premises, and supplementing this by evidence tending to show continuous possession.

In such an action the parties were at issue as to the ownership of a strip of land adjacent to the boundary line between their respective farms, the determination of which depended upon what line constituted the boundary—whether the line of an old fence, as claimed by the plaintiff, or the line of a new fence farther to the north, built by the defendant. The trial court sustained the contention of the defendant and rendered judgment in his favor. *Held* that facts essential to the conclusions reached by the trial court were not supported by the evidence, either as to the defendant's title by deed, or as to his claim of adverse possession, and that the plaintiff was therefore entitled to a new trial.

An ancient deed of the land now claimed by the defendant failed to locate its north boundary—which was practically the line now in dispute—but recited that the conveyance was intended to comprise thirty acres and that the east and west lines were to extend as far northerly as to include that amount of land and no more.

*Held* that inasmuch as no evidence was offered fixing the southerly boundary of this tract at the time the deed was given in 1849, it failed to furnish sufficient data whereby the location of the north boundary could be determined.

Adverse possession of land by one who was not a predecessor in title of the litigant does not support a claim of title to the land by the latter.

The will of a nonresident until probated in this State as required by General Statutes, § 305, is not available to the devisees as evidence of title to land in this State.

Prior to 1882 the will of a nonresident might be proved in this State in the usual way, by presenting and filing a copy, when the original was in the possession of the court in the State of the testator's domicil and beyond the control of the executor.

Although the damages recoverable for wrongfully cutting and removing trees are not limited to their value for wood and timber, the defendant may nevertheless show that as such they were worth little or nothing.

Argued March 4th—decided April 17th, 1913.

ACTION in the nature of ejectment, brought to and tried by the Superior Court in Windham County, *Shumway, J.;* facts found and judgment rendered for the defendant, and appeal by the plaintiff.  *Error and new trial ordered.*

*Arthur L. Shipman,* for the appellant (plaintiff).

*Charles E. Searls,* for the appellee (defendant).

THAYER, J.  In September, 1888, the plaintiff acquired title to a tract of land containing seventy-seven acres, known as the Hall farm, located in the town of Pomfret, abutting westerly on the highway known as the Norwich and Worcester turnpike, easterly on land formerly of Payson Grosvenor, and southerly on land called the Jepson land.  A map or plan of the land conveyed, made by one Sabin, a civil engineer, was made a part of the deed by reference.  There was at the time of the conveyance an old fence extending easterly from

the highway to the Payson Grosvenor land. The line of this fence was designated on the Sabin map as indicating the southern line of the Hall farm, the tract which was conveyed. Shortly after the purchase, the plaintiff set out upon the land, a short distance north of this old fence, a number of oak, elm, and pine trees for ornamental purposes, and to conceal from view upon her premises an old barn which stood upon the Jepson land. She has since conveyed the easterly portion of her purchase to one Ash, but retains the westerly portion.

The defendant claims title to the Jepson land by deed from one Atwater, dated June 12th, 1907. This deed bounds him on the north by the plaintiff's land, west by the turnpike, and east by the Payson Grosvenor land. In 1910 he erected a wire fence in a straight line easterly from the point on the turnpike where the old fence above mentioned began to the point on the Payson Grosvenor land where the old fence ended. The old fence was not straight. In some places it extended north of the line on which the defendant's new fence stands, and at the west end where it left the highway it ran at a considerable angle to the south of the line of the new fence, then ran easterly nearly parallel with it, then ran northeasterly until it crossed the line of the present new fence a little to the east of the plaintiff's present east line. The trees which the plaintiff set out, as before mentioned, and other trees and shrubbery, were upon the land, four fifths of an acre in extent, which is included between this portion of the old fence and the fence which the defendant erected. Some of these trees were cut down, and some were grubbed out by the defendant, and others were trimmed and left standing. These facts were not disputed.

The defendant claims that his land extends to the line of the new fence. The plaintiff claims that her line

extends to the line of the old fence, and it is for the defendant's entry upon the land north of that, and his erection of the fence and damage to the trees and shrubbery, that she brings this action.

The court has found, as conclusions from other facts stated in its finding, "that the plaintiff had not title to the premises in dispute, but the defendant had such title, and that the true line between their lands was that claimed by the defendant on which was built a new fence."

The plaintiff claims that these conclusions are wrong, and that the facts upon which they are based are found without evidence and against the evidence, and asks to have the finding corrected and the judgment reversed.

An examination of the evidence convinces us that these claims must be sustained. Among the facts found, upon which the court's conclusion is founded, are these: Edgar M. Smith, in 1849, conveyed by warranty deed to Eliza Hall Ward the Jepson tract, bounded therein easterly by Payson Grosvenor, westerly by the Norwich and Worcester turnpike road, southerly by land of Job Williams, and northerly by remaining land of the grantor; the deed reciting that "these presents being intended to comprise thirty acres of ground with a dwelling-house and buildings where Mrs. B. Partridge now resides, the east and west lines extending as far northerly as will include thirty acres and no more." Eliza Hall Ward died domiciled in New York, intestate, in 1872, leaving as her sole heir at law a son, Henry H. Ward. Said Henry H. Ward subsequently, in the year 1872, died, leaving a will executed agreeably to the laws of New York, and admitted to probate there by the Surrogate's Court of the county of New York, but which has not been proven or recorded in any Court of Probate in this State. In a

proceeding by those claiming to be residuary devisees of this tract under this will, a partition sale was made of the Jepson tract. The grantee under this sale conveyed the tract to Atwater, who was the grantor of the defendant. Ellen M. Sessions, mentioned in the third clause of the will of Ward, died November 12th, 1888. Mary Hall Sessions, her daughter, named in the same section of the will, and who married Charles Jepson, died in 1883. Ann Eliza Partridge, named in the will, died in 1902. Said Charles Jepson died between 1902 and 1905. The original line of the old fence was practically the same as the line of the defendant's new fence. The defendant and his predecessors in title have been in the open, notorious and exclusive possession of the premises in dispute for more than twenty-five years. The southern line of the Jepson tract is not established by the descriptions in any of said deeds, and was not determined by any evidence upon the trial. The area of the defendant's land conveyed to him by Atwater, assuming the line of the old fence to be correct, is twenty-nine acres and seven and one-half rods; if the new line of fence is correct, it is just short of thirty acres. There are many other facts found which the plaintiff claims should be corrected; but from the view which we take of the case it is not necessary to refer to them.

There is no finding that the plaintiff was not in actual possession of the premises in dispute at the time the defendant took the deed of the Jepson tract and committed the trespasses complained of, except the negative one in the finding that the defendant and his predecessors in title have been in exclusive possession thereof for twenty-five years.

The plaintiff alleged ownership and possession of the locus at the time of the alleged trespasses, and in support of her allegations laid in evidence her deed of September 14th, 1888, already referred to, and other deeds

showing title in her to the Hall farm by a complete
chain of mesne conveyances back to the same Edgar
M. Smith through whom the defendant claims to trace
his title, and who, it was agreed by the defendant's
counsel, had title in 1849 to the entire tract comprising
the Hall farm and the Jepson land. She supplemented
this evidence of title by evidence tending to show con-
tinuous possession by her as owner ever since her pur-
chase of the premises described in her deed up to the
old fence indicated on the Sabin map. She thus made
out a prima facie case of both ownership and possession.

The defendant claimed that the deed from Smith to
Mrs. Ward, in 1849, carved out of the entire farm,
which he then owned, a tract of precisely thirty acres.
The deed does not fix the northern boundary. It is to
be north of the Partridge buildings, and the side lines
are to extend as far north as will include thirty acres.
If the termini of the southerly boundary were then
known to the parties, as we must presume they were,
the description could be made certain by measuring
an equal distance northerly on each side line to points
where a straight line, or a line parallel with the south-
erly line joining them, would leave a tract of thirty
acres to the south of it. It would seem that one of
these lines must have been intended, unless there was
at the time a fixed monument, like a fence, on the north,
which was understood to be the boundary. If we as-
sume that precisely thirty acres was intended to be con-
veyed, that fact cannot, upon the facts found, aid us
in determining where the line would be, because the
court has found that there was no evidence fixing the
southern boundary of the tract at the time of the origi-
nal conveyance. If the southern boundary was then
the same as it was at the time of trial, neither the old
fence line nor the defendant's new fence line gives pre-
cisely thirty acres. The court finds that a previous

mortgage deed of this same tract had been given by Smith's grantor in 1840, bounding it by the same east, west, and south lines, and on the north by land of the grantor, and reciting that "the premises being intended to comprise about thirty acres of ground, including the dwelling-house where Mrs. B. Partridge now resides." It is hardly conceivable that such a deed would have been given had there not been a boundary fence at the north which divided the grantor's farm so as to leave what the parties believed to be about thirty acres to the south of it. The description was too indefinite for a valid deed, unless there was some monument, because there were no data contained in the deed by which the north line could be run. But if this was, as the defendant claims, the same tract which he now claims to own, it conveyed, not thirty acres, but "about thirty." Either the old fence line or the new fence line would answer that description, and we get nothing from these deeds from which it can be said that either line is correct. The defendant, therefore, proved no title to the locus, unless it was acquired by adverse possession.

There was no evidence to support the finding that the old fence ever stood upon the line of the defendant's new fence, and that the tendency of the repairs and replacements upon it was to push it farther south. If the call of the original deed of the Jepson tract for thirty acres, in connection with evidence showing the line of the southern boundary at the time, could only be satisfied by the line of the new fence, the inference might be claimed that it was the original line of the old fence; but, in the absence of knowledge as to the original south line of the Jepson land, no such inference as to the original north line can be drawn.

The undisputed evidence was that under an arrangement of the occupants of the adjoining properties, those of the Hall farm repaired the east half of the old

fence, and the occupants of the Jepson land repaired the west end. It is hardly assumable that the party having the west end to repair would push it to the south upon the land in his own occupancy. Certainly such finding should not be made without positive and satisfactory evidence to support it.

The defendant claimed, and the court found, that he and his predecessors in title had had the exclusive adverse possession of the disputed premises for a sufficient time to give the defendant title. The evidence does not support this finding. The defendant did not claim to show title in a third person, and the court has found that the title is in him, not in a third person. There was evidence tending to show that Charles Jepson, who occupied the Jepson land, had from 1888 or earlier up to the time of his death in 1904, had some chicken coops and chickens under the pines upon the land north of the old fence, and had allowed his calves tethered south of the old fence to go through it, and browse on the land north of the fence. There was no evidence showing that any other person had occupied it except the plaintiff, and there was undisputed evidence that she had mowed the grass upon the disputed tract, had trimmed the trees, and had exercised other acts of ownership over it at the time Jepson had his chickens there under the trees. The defendant does not claim under Jepson, so that, if the evidence would warrant a finding that he had occupied the premises long enough and under circumstances such that he might claim title, this alone would not help the defendant. He can get advantage from such occupancy only by showing that it was under his predecessors in title. He attempted to show a paper title through the Ward will, and a title by adverse possession through the devisees under the will. The admission of the will was objected to, and the court's ruling admitting it is as-

signed for error. Regardless of the question of admissibility of the will in evidence, we think that, if it were conceded that the devisees under it were predecessors in title of the defendant, there was no evidence to warrant a finding that Jepson's possession, if proved, was their possession. The will, if valid, gave to Ellen M. Sessions and her daughter, Mary Hall Sessions, an estate for their joint lives in the Jepson land, an estate for her own life to the survivor, and then the land was to sink into the remainder and residue of the estate, which was given to trustees in trust to manage and pay over the income to Eliza Ann Partridge during her life, and upon her death the remainder was given to three ·cousins of the testator and their issue. Mary Hall Sessions married Charles Jepson, and died in 1883. Ellen M. Sessions died in November, 1888, less than two months after the plaintiff's purchase of the Hall farm. Mrs. Partridge died in 1902. Under the will all interest of Mrs. Sessions and her daughter in the Jepson land ended with the mother's death in November, 1888. Charles Jepson, as husband of the daughter, retained no interest in it under the will. The legal title to the land, had the will been probated in this State, would have passed at the death of Mrs. Sessions to the trustees for the use of Mrs. Partridge. There was no evidence tending to show that the trustees or the beneficiary, Mrs. Partridge, until her death in 1902, or the devisees of the remainder after her death, ever occupied the land in dispute personally, or that Jepson occupied under them as tenant ·or otherwise. After Jepson's death in 1904 his chicken coops were sold, and all of any value, including those upon the disputed tract, were removed. A few boxes with slats, of no value, were not removed. There was no evidence tending to show that the disputed land was occupied by any one other than the plaintiff after Jepson's death until the

defendant's trespasses after his purchase. The court was not justified, therefore, in finding from Jepson's occupancy an occupany by the predecessors in title of the defendant, had it been proved that the devisees under the will of Ward were such predecessors.

But the will, the only evidence from which the court could have found that the devisees of Ward had title to the Jepson land, was not admissible to show title in them without proof of its probate in this State. Probating the will in New York did not give it validity as a will in this State. Our statute provides that a will executed according to the laws of the State or country where executed may be admitted to probate in this State, and shall be effectual to pass the title to the estate of the testator situated here. General Statutes, § 293. And the probate in this State of wills of nonresident testators passing title to lands in this State, has long been required by statute. Such provisions are found in the Revision of 1821, p. 200, § 9, in the Revision of 1902, § 305, and in every intervening revision of the statutes. Without complying with these statutes, no title to real estate can pass in this State by the will of a nonresident. The laws of the State of domicil validating and approving the will there can give it no validity here. The law of the State where the land is situated controls. *Irwin's Appeal,* 33 Conn. 128, 136; *Ives* v. *Allyn,* 12 Vt. 589, 593; *Barstow* v. *Sprague,* 40 N. H. 27, 32; *Dibble* v. *Winter,* 247 Ill. 243, 251, 93 N. E. 145; *Robertson* v. *Pickrell,* 109 U. S. 608, 611, 3 Sup. Ct. Rep. 407. Our statutes require the executors of wills to cause certificates, giving the names and residences of devisees and distributees under a will, and the interests which they take in the land, to be recorded in the town where the land is situated, thus keeping complete upon the land records of the town the title to the lands situated therein. The probate judges are required to

report to the State treasurer estates pending within their courts liable to pay succession taxes. These provisions could be avoided in the case of nonresidents' wills, if they were valid to pass title without probate here.

Section 305 of the General Statutes provides that the foreign executor of a will conveying property in this State may file here in the appropriate Court of Probate an exemplified copy of the will proved in the State of domicil, and such copy, if no sufficient objection is shown after proper notice given, may be filed and recorded by the court, and have the same effect upon property so conveyed as if the will had been originally proved in such court. This provision did not exist in 1872, when the will here in question took effect in New York, and it is said that as the statute then in force provided only that the will of the nonresident might be proved in this State, it could not be proved by copy, and as the original would be probated by and in the possession of the court of the State of domicil and beyond the control of the executor, the statute in force when the will took effect must be held to be merely permissive and not mandatory, and the will proved there held to be valid to convey title to land in this State. The provision in the present law allows the Court of Probate, if no sufficient objection is made, to approve the will upon proof, by exemplified copy, that it has been proved and approved by the court where the testator resided. Under the law in force in 1872, when the will here in question took effect, the nonresident's will was proved in the usual way, upon presenting and filing a copy where the original was in possession of the court where it was proved and was beyond the control of the executor. *Willetts' Appeal*, 50 Conn. 330, 332, 340. The present statute allows the will to be approved upon different evidence of its validity than the original Act

required. That is its effect. There was nothing to prevent the proof of the will by copy in the usual way at the date of the testator's death. This not having been done, the will has no effect to convey the title of the property in question to the devisees named therein, and was not admissible in evidence.

The defendant's claim, that the will was admissible as characterizing the possession of the devisees, is answered by the fact that they were not shown ever to have been in possession of the disputed premises since 1888. Admitted for what it was worth, it should have been excluded when it was not shown to be worth anything.

The evidence of Davenport was properly admitted. While the rule of damages in a case like this does not limit the plaintiff's recovery for loss of trees to the value for wood or timber of the trees cut and carried away by the defendant, their value might properly have been claimed to be an element of the damage suffered by her, and it was proper to allow the defendant to show that, as timber or wood, they were of little or no value.

The finding is corrected by striking therefrom the twenty-seventh and the twenty-eighth paragraphs thereof. When so amended, the finding does not support the conclusions that the plaintiff is not, and that the defendant is, the owner of the land in dispute, and that the true line between the plaintiff's land and defendant's is the line of the new fence.

There is error and a new trial is ordered.

In this opinion the other judges concurred.